Argued and submitted March 12, affirmed May 2, 2007

# LANE COUNTY SCHOOL DISTRICT 4J,
## Jackson County School District 549C,
## and Marion County School District 24J,
*Petitioners,*

*v.*

# OREGON SCHOOL ACTIVITIES ASSOCIATION,
*Respondent,*

*and*

# SUPERINTENDENT OF PUBLIC INSTRUCTION,
*Intervenor-Respondent.*

Superintendent of Public Instruction
5810210042; A132577

157 P3d 1241

Joel S. DeVore and Timothy Gerking argued the cause for petitioners Lane County School District 4J and Jackson County School District 549C. With them on the joint briefs were Luvaas Cobb and Brophy Mills Schmor Gerking.

Paul A. Dakopolos argued the cause for petitioner Marion County School District 24J. With him on the briefs were J. Kevin Shuba and Matthew T. Racine.

Jonathan M. Radmacher argued the cause for respondent. With him on the brief was McEwen Gisvold, LLP.

Richard D. Wasserman, Attorney-In-Charge, Civil/Administrative Appeals Unit, argued the cause for intervenor-respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Rolf C. Moan, Assistant Attorney General.

Before Haselton, Presiding Judge, and Edmonds and Landau, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Petitioners, three of Oregon's largest school districts, challenged a plan adopted by the Oregon School Activities Association (OSAA) in October 2006 that (1) increased the number of classifications for interscholastic competitions from four to six and (2) substantially modified the membership of districts (leagues) within those classifications. In particular, petitioners contended that the plan as a whole was invalid because OSAA, in creating the plan, had violated ORS 339.430(3) by applying unauthorized "criteria," including school enrollment thresholds, and by systematically prioritizing certain "criteria." In addition, petitioners contended that specific districting placements—including the inclusion of South Eugene and Sheldon High Schools in the Southwest Oregon Conference, the denial of other Eugene-Springfield area high schools' requests to "play-up" to the 6A classification in a league with South Eugene and Sheldon, and the inclusion of Redmond High School in the Central Valley Conference with the Salem-Keizer high schools—did not comport with the "criteria" OSAA purported to apply. The State Superintendent of Public Instruction (superintendent), as a delegee of the State Board of Education (board), OAR 581-021-0042(4), ultimately rejected petitioners' challenges.

Petitioners now seek judicial review of the superintendent's final order. As amplified below, we reject each of petitioners' challenges. Accordingly, we affirm.

## I. OVERVIEW

A. *Applicable Statutes and Rules*

Before describing the operative facts and the history of this dispute, it is useful to outline the statutes and administrative rules that underlie the parties' positions and the superintendent's analysis and that frame our review. Three provisions are most significant. First, the statutory centerpiece, or epicenter, of this dispute is ORS 339.430. That statute provides:

"(1) Voluntary organizations that desire to administer interscholastic activities shall apply to the State Board of Education for approval.

"(2)   The board shall review the rules and bylaws of the voluntary organization to determine that the rules and bylaws do not conflict with state law or rules of the board.

"(3)   A voluntary organization must submit to the board for review any rules, or changes in rules, that specify the criteria for the placement of a school into an interscholastic activity district. A voluntary organization may not establish or change an interscholastic activity district until the board has approved the rules of the voluntary organization.

"(4)   If a voluntary organization meets the standards established under ORS 326.051 and its rules and bylaws do not conflict with state law or rules of the board, the board shall approve the organization. An approved voluntary organization is qualified to administer interscholastic activities.

"(5)   The board may suspend or revoke its approval if an approved organization is found to have violated state law, rules of the board or subsection (3) of this section. If a voluntary organization is not approved or its approval is suspended or revoked, it may appeal the denial, suspension or revocation as a contested case under ORS chapter 183.

"(6)   A voluntary organization's decisions concerning interscholastic activities may be appealed to the board, which may hear the matter or by rule may delegate authority to a hearing officer to hold a hearing and enter a final order under ORS chapter 183. Such decisions may be appealed under ORS 183.482."

We address that statute's proper meaning and application in detail below. *See* 212 Or App at 386-93.

Second, the board has promulgated an administrative rule, OAR 581-021-0042, prescribing procedures for administrative challenges initiated pursuant to ORS 339.430(6). As pertinent to our discussion, that rule states, in part:

"(1)   A decision of a voluntary organization concerning interscholastic activities that adversely affects or aggrieves a person or entity may be appealed by such person or entity to the State Board of Education (Board). Appeal may be brought only after exhaustion of internal review by the voluntary organization.

"* * * * *

"(4)   The Board delegates the Superintendent as hearing officer, to cause appropriate notices of hearing to be served upon the voluntary organization and the petitioner, to engage in all administrative functions necessary or reasonable and to render a final order in the appeal. The matter shall be heard as a contested case pursuant to ORS 183.310 to 183.502.

"* * * * *

"(8)   The Superintendent may reverse or modify a decision of a voluntary organization if the petitioner establishes that the decision of the voluntary organization was in error. *A decision of a voluntary organization is in error when the decision violates federal or state constitutions or laws; rules of the Board; the voluntary organization's own rules in a manner that if not done in error would alter the decision; or, if there is no rational basis for the decision.* The Superintendent will consider the voluntary organization's interpretations of its rules, policies or standards unless such interpretation is not reasonable, as determined by the Superintendent. Review of the decision of the voluntary association will not be confined to the record of the voluntary association if to do so would deprive the petitioner of an opportunity to provide evidence relevant to the appeal.

"(9)   *In addition to the requirements of paragraph (8), for appeals brought concerning ORS 339.430(3) the Superintendent may reverse or modify a decision of a voluntary organization if the decision is inconsistent with or failed to consider all the criteria established by the rules of the voluntary organization and approved by the board under ORS 339.430(3)."*

OAR 581-021-0042 (emphasis added).

Third, and finally, as specified in ORS 339.430(6), our judicial review of the board's, or its delegee's, final order is pursuant to the provisions of ORS chapter 183. Accordingly, our review is defined and circumscribed by ORS 183.482(8). That statute provides:

"(a)   The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A)   Set aside or modify the order; or

"(B)   Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b)   The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A)   Outside the range of discretion delegated to the agency by law;

"(B)   Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C)   Otherwise in violation of a constitutional or statutory provision.

"(c)   The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

## B.   *Factual Background and History of the Dispute*

OSAA is a voluntary association of public and private high schools in Oregon that was formed in 1918 to administer interscholastic activities that it sponsors. Historically, OSAA member schools have been divided into different classifications based on student enrollment, and schools within each classification have been divided into "districts" (commonly referred to as "leagues" or "conferences"). Under certain circumstances or conditions, member schools, upon application, have been permitted to "play-up" into a different classification—*i.e.*, to compete with larger schools—or, more rarely, to "play-down" to compete in a classification composed of smaller schools.

For many years before 2006, OSAA member schools competed, for championship purposes, within four classifications, with schools' classification and district assignments being reviewed every four years. In 2002, OSAA reassigned Hood River Valley High School from the Mt. Hood Conference, which consisted almost exclusively of schools located in east Multnomah County, to the Intermountain Conference, whose members included, for example, Pendleton and

Hermiston High Schools. Hood River Valley High School unsuccessfully challenged that reassignment. In the next (2003) legislative session, Senator Rick Metzger, whose district included Hood River, introduced Senate Bill 388, which, after some modification and debate (which we describe in detail below) was codified, as revised, at ORS 339.430(3). Again, ORS 339.430(3) provides:

> "A voluntary organization must submit to the board for review any rules, or changes in rules, that specify the criteria for the placement of a school into an interscholastic activity district. A voluntary organization may not establish or change an interscholastic activity district until the board has approved the rules of the voluntary organization."

At the time the legislature enacted the 2003 amendments to ORS 339.430, OSAA's constitution included Article 6.1.5, which specified school attendance numbers used to classify schools into four classifications, with Class 1A being used for the smallest schools (115 or fewer students) and Class 4A for the largest (more than 900 students). The OSAA constitution also included Article 7, which set forth the number of districts in each classification—*e.g.*, nine districts for Class 4A; five districts for Class 1A. Finally, as of 2003, the OSAA constitution included Article 9, pertaining to OSAA's "Classification and Districting Committee." Article 9.2.1 described that committee's "charge":

> "Charge. The Committee shall make recommendations to the Executive Board regarding classifications and districts for the upcoming four-year time block. The duties and responsibilities of the Committee shall be:
>
> "(a)  To hold public hearings and provide correspondence to interested parties regarding classifications and districts for the upcoming four-year time block.
>
> "(b)  To hear testimony from any school or other interested party, including information on the numbers of students currently enrolled in grades 8, 7 and 6.
>
> "(c)  To make recommendations to the Executive Board regarding classifications and districts and enrollment limits for the upcoming four-year time block.

"(d)    To consider *the following criteria, among any other they deem relevant*, for recommending placement of schools in athletic districts:

"(1)    geographic location;
"(2)    cost of travel;
"(3)    scheduling problems;
"(4)    athletic district balance;
"(5)    athletic district history;
"(6)    move as few schools as possible;
"(7)    enrollment;
"(8)    maintain schools within the same school district in the same league;
"(9)    loss of class time.
"NOTE:    *The above list is not in any priority order.*"

(Emphasis added.)

In accordance with the directive in ORS 339.430(3) to submit to the board "any rules, or changes in rules, that specify the *criteria* for the placement of a school into an inter-scholastic activity district" (emphasis added), OSAA submitted the above-described provisions of Articles 6, 7, and 9 of its constitution to the board in May 2004. In his cover letter to the board, OSAA's Executive Director, Tom Welter, identified those articles as OSAA's "rules and regulations 'that specify the criteria for the placement of a school into an interscholastic activity district.' " The board did not take action on OSAA's submission at that time.

Beginning in the summer of 2004, the OSAA's "Classification and Districting" committee held a series of public meetings and work sessions to come up with a new districting plan for the 2006-2010 school years. After receiving and considering substantial, and occasionally vehement, input from member schools, the committee ultimately concluded that a six-classification system would be superior to a four-classification system. Accordingly, in mid-2005, the committee recommended to OSAA's Executive Board that Article 6 be amended to create a six-classification system. The committee also recommended that the number of districts be increased and recommended which schools should be in which districts. Although the committee considered all nine criteria set forth

in Article 9.2.1(d) in reaching its conclusions and recommendations, it applied as "primary priorities" the following three considerations "in the order listed":

"1.  Improve competitive balance within a league.

"2.  Minimize travel / expense for schools.

"3.  Maintain current league alignments."

Most significantly, for purposes of the present dispute, the proposed new classification scheme effectively divided the then-existing 4A classification into two new classifications, 6A and 5A, with, in many instances, a concomitant creation of new districts or substantial reconfiguration of existing districts. For example, under the new plan, the seven high schools in the Eugene-Springfield area, which had long competed in the Class 4A "Midwestern League," would be divided, with the two largest schools, South Eugene and Sheldon, designated as Class 6A schools, and the other five—Churchill, North Eugene, Springfield, Thurston, and Willamette—designated as Class 5A schools. That division, in turn, led to a reconfiguration of districts, with the five smaller schools remaining (along with Marshfield High School) in a Class 5A "Midwestern League," and Sheldon and South Eugene being assigned, along with the four largest schools from the former eight-team Southern Oregon Conference—North Medford, South Medford, Grants Pass, and Roseburg—to compete in the newly created Class 6A "Southwest Conference."[1] Similarly, under the new plan, only one member of the former Class 4A "Intermountain Conference," Redmond High School, was large enough to qualify as a Class 6A school—and was assigned to the new Class 6A "Central Valley Conference" composed otherwise of the six Salem-Keizer District high schools that had formerly been members of the Class 4A "Valley League."

On September 15, 2005, the board, acting pursuant to ORS 339.430(3), approved Article 9.2.1(d) of the OSAA constitution. The minutes of that meeting show that the board was aware that OSAA had submitted criteria in May, but the minutes of the September 15, 2005, meeting do not

---

[1] The four smallest schools from the former Southern Oregon Conference (Ashland, Crater, Eagle Point, and Klamath Union) were assigned, with Mazama High School, to the Class 5A "Southern Sky Conference."

mention the content of Articles 6 and 7, which were included in that submission. Rather, the board's discussion focused exclusively on the criteria described in Article 9. Nothing in the board's minutes alludes to any awareness that OSAA was engaged in a process of determining whether to completely revamp its four-tier classification scheme.

In October 2005, OSAA's Executive Board considered applications from various member schools to "play-up" or "play-down" out of their putative classifications. Many of those applications, particularly by high schools in the Portland metropolitan area, were allowed. However, OSAA rejected an application by the five putative "5A" Eugene-Springfield high schools to "play-up" into a 6A league to be composed solely of those schools, along with South Eugene and Sheldon.

Later in October 2005, the OSAA delegate assembly adopted the six-classification system along with the proposed districting plan within those classifications. As noted, under the plan as adopted, South Eugene and Sheldon High Schools were assigned to a 6A district that also included North Medford, South Medford, Roseburg, and Grants Pass High Schools. As noted, the plan as adopted also assigned Redmond High School to a 6A conference that included North Salem, South Salem, McKay, McNary, and Sprague High Schools (all of which had enrollments over the 6A "threshold"), as well as West Salem High School, whose "play-up" application was granted.

Ultimately, nearly one-third of the high schools that were assigned to 6A leagues were so designated because of the allowance of their "play-up" applications—that is, they would otherwise have competed as members of districts in lower classifications because their enrollment was less than the Class 6A "threshold" of 1,521 students or more. Before adopting the new six-tier classification and the resulting district alignments, OSAA never sought, or obtained, board approval of the amendments to Article 6.1.5 that increased the number of classifications from four to six and that identified the enrollment threshold for each classification.

## C. *The Administrative Review Proceedings*

In November and December 2005, petitioners sought administrative review of OSAA's decision by the board pursuant to ORS 339.430(6). In January 2006, the board promulgated OAR 581-021-0042, described above, specifying procedures and standards of review for such challenges and delegating its authority to "hear and enter final orders" and such challenges to "the superintendent of public instruction or the superintendent's designee." OAR 581-021-0042(4). The superintendent, in turn, delegated to a hearing officer the authority to hear the appeals concerning OSAA's redistricting decision. The hearing officer consolidated the various appeals. Petitioners subsequently moved for a summary determination of their challenges, contending, in part, that the new plan was adopted in violation of ORS 339.430(3) because the six-tiered enrollment thresholds in Article 6.1.5 constituted "criteria" that required board approval under that statute. The hearing officer recommended allowance of petitioners' motions on that ground, and others. On March 13, 2006, the superintendent rendered an interlocutory ruling that, while rejecting most of the hearing officer's analysis and conclusions, agreed that the amended Article 6.1.5 embodied "criteria" requiring board approval under ORS 339.430(3). In that regard, the superintendent stated:

"The Legislature did not define 'criteria' within the statute so the word must be construed according to its plain or ordinary meaning. *Liberty v. State of Oregon*, 200 Or App 607, 613 (2005); *see also Walter v. Scherzinger*, 339 Or 408, 423-24 (2005) (giving 'service' its plain meaning); *Keller v. Armstrong Industries, Inc.*, 197 Or App 450 (2005). 'Criteria,' the plural of criterion, is defined as 'a means for judging, test, standard; a test, principle, rule canon or standard by which anything is judged or estimated.' The Oxford English Dictionary, 1179 (1976).

"Reading subsection (3) in a manner consistent with its ordinary meaning, the statute requires voluntary organizations such as OSAA to obtain Board approval for any rule changes setting standards for placing schools into interscholastic activity districts. Under the statute, OSAA may not establish or change interscholastic activity districts until the Board has approved rules specifying those changed standards. Any other reading requires a narrower

interpretation of the statute than is required by the plain meaning of subsection (3).

"The basic question is whether the Board is bound by OSAA's limited description of 'criteria,' set out in Article 9 as a set of standards to apply when one of its committees recommends changes to the classification and districting schemes, or whether it may rely on a common-sense reading of the statute and OSAA's rules to determine what constitutes 'criteria' under ORS 339.430(3). Precepts of statutory construction do not require recourse to legislative history to determine that 'criteria' for changing interscholastic activity districts also requires consideration of the rules outlining how schools are classified.

"The number of classifications and the ADM cut offs for those classifications represent a 'means for judging' how schools will be placed into interscholastic activity districts. Article 9.2.1(d)(7) lists enrollment as a criteria and Article 6.1.5 further refines that criteria. It is difficult to understand how OSAA can view enrollment as a criteria in Article 9.2.1(d)(7), and not also concede that the population ranges of student enrollment as reflected in Article 6.1.5 are not also criteria."

(Footnote omitted.) The superintendent gave OSAA 30 days to seek the board's approval of the amended Article 6.1.5.

Pursuant to that interlocutory ruling, OSAA submitted the amended Article 6.1.5 to the board. The board, however, declined to either approve or disapprove that submission. Rather, the board unanimously approved the following resolution:

"[T]he board finds that Oregon School Activities Association Article #6.1.5 is not a criteria that requires approval by the board pursuant to ORS 339.430(3), and requests that the superintendent modify her interlocutory ruling to reflect this determination, or that she delegate the matter back to the board so it may make that finding, for the purpose of expediting the hearings on the appeal and to ensure a fair process based on the record developed at the hearing."

On May 4, 2006, the superintendent issued an amendment to her previous interlocutory rulings, modifying them to state that OSAA's failure to secure board approval of the amendments to Article 6.1.5 did not violate ORS 339.430(3). Besides

deleting certain material from her prior ruling, the superintendent added the following observation:

"The number of classifications and [enrollment] cut-offs for those classifications represent the application of Article 9.2.1(d) to the existing array of schools that are members of the OSAA. Article 6.1.5 is the result or outcome of the application of the criteria in Article 9.2.1(d). Article 6.1.5 is not a criteria subject to the requirements of ORS 339.430(3)."

Ultimately, on June 9, 2006, the superintendent entered a final order, which rejected each of petitioners' arguments. In her final order, the superintendent made the following rulings that are pertinent to judicial review: (1) The board's request that the superintendent modify her interlocutory order did not deprive petitioners of any rights. (2) Certain issues that petitioner Marion County School District attempted to raise at the hearing were not properly at issue because its complaint had not encompassed those issues. (3) OSAA's redistricting plan was not arbitrary or inconsistent with its criteria for classification and districting found in Article 9.2.1. (4) OSAA did not use criteria that had not been approved by the board pursuant to ORS 339.430(3) when making "play-up" and "play-down" decisions. (5) OSAA did not fail to comply with its own rules in making "play-up" and "play-down" decisions.

## II. LEGAL ANALYSIS

On judicial review, petitioners raise a host of challenges, procedural and substantive, concerning the events described above. There are several overarching issues that all petitioners raise. Two predominate: *First*, did the superintendent correctly determine that OSAA's amendment to Article 6.1.5 to create the six-tiered classification system was not a change in a rule "that specif[ies] the criteria for the placement of a school into an interscholastic activity district"? ORS 339.430(3). *Second*, did the superintendent err in concluding that the OSAA's prioritization of certain of the criteria among the nine listed in Article 9.2.1(d) in crafting the 2006-2010 plan was not a change in a rule within the meaning of ORS 339.430(3)?

In addition to those issues, petitioners assert that the board acted improperly in requesting the superintendent

to alter her interlocutory ruling on the issue of whether the amendment to Article 6.1.5 should have been submitted to the board. Petitioners Lane County School District and Jackson County School District also contend that the superintendent erred in rejecting their arguments that OSAA used unauthorized criteria in making "play-up" and "play-down" decisions, that OSAA improperly rejected the application of Eugene area schools to "play-up," and that OSAA improperly placed Medford and Eugene schools into the same district. Petitioner Marion County School District argues that the superintendent erroneously reviewed "the OSAA redistricting decision using a statewide perspective rather than the perspective of the individual schools that were appealing the OSAA decision," and also that the superintendent erred in concluding that certain issues that it attempted to raise shortly before the hearing were not properly at issue because they were beyond the scope of the complaint.

For the reasons that follow, we reject each of those challenges.

## A. *ORS 339.430 and Article 6.1.5*

Petitioners' contention that OSAA was required under ORS 339.430(3) to submit and obtain the board's approval of revised Article 6.1.5 reduces to a question of statutory construction: Does the designation of enrollment thresholds for the six classifications "specify the criteria for the placement of a school into an interscholastic activity district?" ORS 339.430(3).

■ In construing a statute, its words "typically should be given their plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). "Criteria" is the plural of "criterion," which is defined as follows:

> "1 : a characterizing mark or trait ‹increased speed, climb, and ceiling, three of the four basic *criteria* of air combat — *Science News Letter*› ‹a special constitutional ~ of that person —*Jour. Amer. Med. Assoc.*› 2 : a standard on which a decision or judgment may be based ‹the accepted *criteria* of adequate diet› : a standard of reference : YARDSTICK : an

identifying indication ‹what then are the *criteria* of a desir-able organization of utilities —*Harper's*› : a basis for dis-crimination : GROUND[.]"

*Webster's Third New Int'l Dictionary* 538 (unabridged ed 2002) (emphasis in original).

Petitioners posit that a provision stating the actual numbers used as enrollment thresholds (or "cutoffs") for plac-ing schools into classifications identifies a standard on which a decision about placement may be based. That is, depending on whether a school's enrollment is above or below the speci-fied threshold, that fact will presumptively determine the school's classification (absent the allowance of a "play-up" or "play-down" application)—and that, in turn, will determine the districts in which the school *may* be placed (the districts within the same classification) and those in which it *cannot* be placed (districts in any other classification). Thus, peti-tioners assert, the particular enrollment cutoffs are qualita-tively different in their effect than "enrollment" as a general placement consideration. That is so because the former are functionally prescriptive and exclusive, while the latter—like the other eight "criteria" in Article 9.2.1(d)—is merely normative.

Conversely, OSAA and the superintendent take a broader view of "criteria." They contend that "criteria" (or cri-terion) here is used in the sense of a pertinent considera-tion—and that the particular numbers are merely refine-ments of the "standard" or "trait" of "enrollment" generally, *i.e.*, relative school size. Indeed, OSAA and the superinten-dent contend that the thresholds listed in Article 6.1.5 are merely the product of OSAA's consideration and application of the "enrollment" criterion in Article 9.2.1(d). Thus, OSAA and the superintendent reason, because "enrollment" was one of the nine criteria listed in Article 9.2.1(d), which was duly approved by the board pursuant to ORS 339.430(3), the board was not required to also approve the subsequent change to Article 6.1.5.

Either construction of "criteria" is plausible. Given the breadth of the definition of "criterion" quoted above, the term could be used to describe something very general *or* something very specific. That is, we cannot tell from the word

itself whether the legislature intended OSAA to submit to the board a general criterion, such as "enrollment" in the sense of relative school size, or a specific criterion, such as "enrollment cutoff of 1521 for placement of a school into a 6A classification in the 2006-2010 districting plan." Nothing in the other subsections of ORS 339.430 provides any contextual clue concerning the legislature's intent. Because either construction is plausible, we turn to the legislative history of ORS 339.430(3). *PGE*, 317 Or at 611-12.

As noted, ORS 339.430(3) was derived from 2003 Senate Bill (SB) 388. *See* 212 Or App at 379. As originally introduced by Senator Metzger, SB 388 would have required the OSAA to establish by rule that placement of schools into districts be based on "school size, minimizing loss of instruction time, minimizing cost and minimizing student travel time." It was referred to the Senate Education Committee. At a public hearing held on February 25, 2003, Senator Metzger announced that the committee would be considering the "dash 2 amendments," which represented a compromise with OSAA, which opposed the bill as originally introduced. Tape Recording, Senate Committee on Education, SB 388, Feb 25, 2003, Tape 21A (statement of Sen Rick Metzger).

The OSAA Executive Director, Tom Welter, and the OSAA Assistant Executive Director, Mike Wallmark, then gave the committee an overview of how the OSAA districting process functioned. In explaining the composition and operation of the Classification and Districting Committee, Wallmark referred in passing to both Article 6 and Article 9 of OSAA's constitution. OSAA's position was, in effect, that it needed to utilize all of the criteria listed in Article 9.2.1(d)—and not just the four criteria that SB 388 would have mandated—in order to make districting decisions fairly. The following exchange occurred:

"SEN MORRISETTE: Now if I were to do some independent research and look up the reclassification criteria in your constitution, would I look under Article 6 or Article 9?

"MIKE WALLMARK: You would look under Article 9, which is where the classification and districting committee is defined.

"SEN MORRISETTE:   I think you said Article 6.

"MIKE WALLMARK:   Article 6 gives a charge to the committee. It says what the purpose of the committee is. Article 9 explains the works of the individual committee.

"SEN MORRISETTE:   Okay."[2]

*Id.*

The committee then heard testimony from Jeff Baker, an attorney from Hood River who had been involved in an appeal of OSAA's 2002 decision to move a Hood River school into a different league. Baker explained the nature of that dispute (which, like the present one, centered mainly around travel) and spoke of the nine criteria contained in Article 9.2.1(d). He supported the legislation because it gave the Department of Education a larger role in the process. *Id.* (statement of Jeff Baker). After some further testimony concerning the Hood River litigation, a parent of a Hood River student then described the negative impact on his son of OSAA's 2002 districting decision. Senator Morrisette suggested that the problems could be traced to declining enrollment in rural schools, and the parent responded that OSAA's move of the Hood River school was *not* a result of *reclassification* of the school based on enrollment—but, instead, a move to a different league within the same classification, which OSAA justified as needed for competitive balance. *Id.* (statement of Rick Dills). Several other witnesses spoke in support of the bill and described the effects on their respective schools of OSAA's decision to move the Hood River school.

Of some significance to our inquiry is an exhibit that OSAA submitted to the committee in opposition to the originally drafted version of SB 388, before the "dash 2 amendments" were drawn up. As noted, the original bill would have codified four criteria—rather than the nine listed in Article 9.2.1(d)—to be used for placement of schools into districts. In its exhibit, OSAA explained:

---

[2] We understand Wallmark's remarks about Article 6 to pertain to the portion of Article 6 that calls for the establishment of the classification and districting committee. No reference was made to the enrollment limits that were specified in Article 6.1.5.

"RECLASSIFICATION CRITERIA: The criteria to be used by the Classification Committee in recommending *classification placements* and league alignments are set by the member schools and are specified in Article 9 of the OSAA Constitution."

Testimony, Senate Committee on Education, SB 388, Feb 25, 2003, Ex A (submitted by Tom Welter) (emphasis added). The exhibit specified the nine criteria found in Article 9.2.1(d): "Geographic Location, Cost of Travel, Scheduling Problems, Athletic District Balance, Athletic District History, Move as Few Schools as Possible, Enrollment, Maintain School within the Same School District in the Same League, and Loss of Class Time." The exhibit went on to explain how the proposed legislation's elimination of certain of those criteria would cause problems in the classification and districting process.

After the public hearing, the committee moved into work session and, without discussion, adopted the "dash 2 amendments" and moved the bill to the floor with a "do pass" recommendation.

On March 5, 2003, the Senate passed the bill,[3] and the following day it was presented to the House. The bill was referred to the House Committee on Education, and a work session was held on the bill on April 14, 2003. At that work session, Senator Metzger spoke briefly in support of the bill:

"Senate Bill 388 comes unanimously out of the Senate. It is a bill that addresses an issue with the Oregon School Activities Association, and I will tell you off the top, in the A-engrossed bill, they were wonderful to work with and that's why we reached this compromise that everyone can support. Specifically, 388 makes it clear that the Oregon School Activities Association, in putting together rules for the possible redistricting of schools and to other school district athletic and activity leagues, it needs to, number one, adopt rules and have those rules adopted by the State Board of Education so that every school, any school in your district or anywhere else within the State of Oregon faced with—it's always a very difficult situation when you are moving to another athletic league and the trepidation that

---

[3] The Senate floor debate, which consisted solely of a statement by Senator Metzger briefly describing the origins of the bill and OSAA's support of it, sheds no light on the issue before us.

causes, is to provide clarity so that everyone knows what the rules of the game are, that the goal posts don't change and that's something that is extremely difficult, that everyone understands what the criteria are to be applied. Under Senate Bill 388, the OSAA continues to make their own rules, but it does provide a hearing process in the sense that they go to the State Board of Education to have them formally adopt it."

Tape Recording, House Committee on Education, SB 388, Apr 14, 2003, Tape 67B (statement of Sen Rick Metzger).

The committee referred it to the House floor with a "do pass" recommendation. The bill passed with little ado, was signed by Governor Kulongoski, and went into effect on January 1, 2004.

■ Although this legislative history is sparse, it is instructive in several ways. First, the only specific discussions of, and references to, "criteria" for placing schools into athletic districts pertained to the criteria specified in Article 9.2.1(d). Those criteria were specifically described to the members of the committee that adopted the "dash 2 amendments." There is no indication that the committee members were even aware of—much less concerned with—the numerical enrollment thresholds (then for four classifications) found in Article 6.1.5.

Second, as noted, the legislation was introduced by Senator Metzger because some of his constituents were unhappy with an OSAA decision to move a high school from one district to another district within the same classification. That dispute did not concern classification based on enrollment, and no concerns were expressed about how the classifications were determined. Thus, there is a strong possibility that, to the extent that the legislature was concerned with "criteria," that concern went only to considerations that directly affect district placement within a single classification, rather than those that might indirectly affect district placement because of a shift in classification.

Third, the only references to "classification" and "reclassification," e.g., in the exhibit to Welter's testimony, stated that the applicable "criteria" were those specified in Article 9. Thus, again, to the extent that the legislature

might have contemplated interdynamics of classification and districting, they would have understood that Article 9, not Article 6, was the locus of "criteria."

■ The significance of each of those considerations must be assessed in a context in which 2003 SB 388 was ultimately enacted with the "dash 2 amendments" as a "compromise" in immediate response to OSAA's opposition and substantial input. While we do not necessarily place a significant amount of weight on self-serving statements made by interested parties during committee hearings, the dynamics of the adoption of the "dash 2 amendments" here strongly suggest that the statute's use of "criteria" corresponds to the explanation of that term by OSAA's witnesses.[4]

From that history, we conclude that the legislature, in enacting ORS 339.430(3), intended that only general criteria, such as those found in Article 9.2.1(d)—and changes to criteria such as those—be submitted to the board for approval. Because "enrollment" is one of the Article 9.2.1(d) criteria, the question becomes whether the amendment to Article 6.1.5, which identifies particular enrollment thresholds for classification purposes, constitutes a substantive change to the "enrollment" criterion of Article 9.2.1(d), so as to require board approval.

We conclude that it does not. The change to Article 6.1.5 reflects no alteration in the fundamental manner in which enrollment data is used in the classification and redistricting process. Both before and after the change in Article 6.1.5, the enrollment criterion was used in classification and districting decisions because of the general precept that schools of similar size should compete against one another. Properly so understood, the numerical thresholds stated in Article 6.1.5 constitute particularized manifestations of the application of the "enrollment" criterion of Article 9.2.1(d)—but do not themselves constitute a separate criterion or change in a criterion requiring board approval pursuant to

---

[4] As the court noted in *State ex rel OHSU v. Haas*, 325 Or 492, 508, 942 P2d 261 (1997), "Although a witness's testimony 'say[s] little about the intent of the Oregon Legislative Assembly as a whole,' *State v. Guzek*, 322 Or 245, 260, 906 P2d 272 (1995), such testimony, when consistent with the enacting legislators' own acts and comments, can provide some insight into legislative intent."

ORS 339.430(3). Thus, the superintendent ultimately correctly determined that the amendments to Article 6, specifically including the six enrollment thresholds of Article 6.1.5, did not require board approval.

## B. *ORS 339.430(3) and Prioritization of "Criteria"*

■ Petitioners next argue that, by employing a rank order prioritization of three "primary priorities" in developing the 2006-2010 plan, OSAA's Classification and Redistricting Committee improperly applied unapproved "criteria." As noted, the committee stated that, in assessing "alternative proposals," it would consider the following "in the order listed":

"1. Improve competitive balance within a league.
"2. Minimize travel / expense for schools.
"3. Maintain current league alignments."

Petitioners' primary argument, as we understand it, is not that the *content* of those three considerations deviated substantively from that of at least some of the nine criteria in Article 9.2.1(d).[5] Nor is it that OSAA, in giving priority to those three considerations, somehow completely failed to apply one or more of the nine criteria in Article 9.2.1(d)—indeed, the superintendent specifically found that OSAA had, in fact, applied all nine of those criteria, and substantial evidence supports that finding. Rather, petitioners' primary complaint is that prioritization *qua* prioritization is itself a "criterion."

In that regard, petitioners emphasize that they do not dispute that, depending on the circumstances of any given districting placement—*e.g.*, whether to move School A from District 1 to District 2—it will be almost contextually inevitable that some considerations will be given greater weight than others. Petitioners contend, however, that

---

[5] Petitioners do advance that argument, *viz.*, that there might be some "slippage" between the three "primary priorities" and the nine Article 9.2.1(d) criteria, as a secondary challenge. That is, they suggest that the three "primary priorities" embody considerations qualitatively different from those expressed in the nine Article 9.2.1(d) criteria. We disagree. We understand the listed "primary priorities" to combine and correspond, respectively, to the following Article 9.2.1(d) criteria: (1) "enrollment" and "athletic district balance"; (2) "geographic location" and "cost of travel"; and (3) "athletic district history" and "move as few schools as possible."

OSAA's "prioritization" here transcends, and is qualitatively different from, such "case-by-case" prioritization. Instead, when certain considerations are given automatic, across-the-board preference in all cases, that structural or systemic prioritization itself becomes a "criterion"—or, at least, a "criterion" of the sort that the legislature intended would require board approval pursuant to ORS 339.430(3). Petitioners contend that, because the three "primary priorities" identified by the committee were automatically given greater weight in rank order in the complete revamping of the classification and districting scheme, that prioritization required board preapproval:

> "Redistricting changed from a gestalt or 'balancing of all the criteria' to a priority-driven approach with size-matching exalted above all else. Because the priorities were limited, the six other considerations, like class time and keeping hometown schools together, no longer mattered as much. The discretion among redistricting options became more limited * * *. [B]y prioritizing three factors, the OSAA had limited the decision-makers to weigh the nine factors and apply them to varying degrees in differing local situations."

In sum, petitioners' principal argument rests on a premise that "structural" prioritization of criteria listed in a rule is itself a criterion. Or, petitioners contend, such prioritization represents at least a substantive change to a rule that, in its original form, prescribed criteria to be considered in rendering a decision but did not prescribe any relative weight to be given those criteria.

We reject petitioners' contention for either of two reasons, one more general and the other more particular. First, we do not understand Article 9.2.1(d), as approved by the board, to preclude OSAA from adhering to a practice and process by which certain criteria are consistently or routinely given greater weight in every "case." Rather, as approved by the board, Article 9.2.1(d) permits OSAA that option. As noted, that provision specifies that "[t]he above list is not in any priority order." *See* 212 Or App at 380. Thus, OSAA's application of the three "primary priorities" was in no way inconsistent with Article 9.2.1(d) and, consequently, did not constitute a "change" in a previously approved "rule" requiring board approval under ORS 339.430(3).

Second, and alternatively, petitioners' argument ultimately depends on a false assumption that, in this context, there is some sort of dichotomy between "case-by-case" application of criteria specified in a rule and "systemic" application of such criteria. Petitioners explicitly acknowledge— as they must—that nothing in Article 9.2.1(d) precludes OSAA from giving certain criteria greater weight than others, depending on the circumstances of a particular "case." However, they insist that each and every school placement in the context of a systemic reorganization constitutes a separate "case"—and, thus, that OSAA, by automatically applying the three "primary priorities" to each of those "cases," impermissibly modified Article 9.2.1(d) from a rule that permitted prioritization of criteria on a "case-by-case" basis to one that prescribes the relative prioritization of criteria in every "case."

The difficulty for petitioners is that their understanding of "case" is, in this context, artificially narrow. Bluntly: The 2006-2010 OSAA reorganization constituted a single "case"—and not dozens, or even hundreds, of individual "cases."

The redistricting or reclassification of any single school has ripple effects that affect other schools—and may, in "chain-reaction" fashion, set off a series of other redistricting moves, each with collateral consequences of its own. Ultimately, because of those inextricably interrelated dynamics, that means that OSAA's periodic statewide review of districting and classification pursuant to Articles 6 and 9 presents a single "case." The "decision" in that "case" is all of an integrated whole: to create a workable plan for the entire state. Thus, nothing in Article 9.2.1(d), as approved by the board, precluded OSAA from determining, as an administrative matter, that certain considerations were consistently entitled to greater weight than others in crafting the 2006-2010 plan.

C.  *Remaining Assignments of Error*

■        We briefly address, and reject, petitioners' remaining assignments of error. First, petitioners vigorously assert that the board engaged in improper "*ex parte*" conduct in suggesting to its delegee, the superintendent, that she should alter

the determination in her interlocutory order that the six classification thresholds in the amended Article 6.1.5 required board approval. However, petitioners have cited no authority for the proposition that any such alleged impropriety entitles them to reversal of the superintendent's final order. In particular, our review is circumscribed by the provisions of ORS 183.482(8)—and petitioners do not explain how the alleged irregularity in the proceeding led to an erroneous interpretation of law, involved an action outside of the range of discretion delegated to the agency, was inconsistent with an agency rule or practice, or otherwise violated a constitutional or statutory provision.

Second, petitioners Lane County and Jackson County School Districts argue that OSAA used unapproved criteria to deny the Eugene-area schools' request to "play-up" into a 6A district and that the superintendent erred in upholding that decision. The superintendent found that "OSAA utilized the criteria in 9.2.1.(d) to make 'play-up' and 'play-down' decisions for the appellants' placement in the 2006-2010 interscholastic activity districts." That finding is supported by substantial evidence in the record.

■ Third, in a related sense, petitioners contend that the superintendent improperly employed a "statewide," rather than "school-specific," standard in reviewing OSAA's districting placements:

> "With a dismissive attitude toward local facts, the superintendent's final order defeats every school's right of appeal. Her new state-wide standard of review prevents any school from ever enforcing the state board's placement rules. If local facts do not much matter, then it would not matter what OSAA does, so long as the rest of the state seems content."

We reject that contention for the same reason that we rejected petitioners' "relative prioritization" challenge: Placement of a school in a district does not occur in a vacuum. As the superintendent observed:

> "Questions regarding a state-wide reclassification cannot and should not be answered solely from the perspective of individual schools. Classification and redistricting of a

state-wide system can only be viewed from a state-wide perspective, while taking into consideration the concerns of individual schools."

That approach does not, as petitioners contend, preclude consideration of an individual school's circumstances. It does, however, correctly recognize that such concerns must ultimately be assessed in a much broader context.

■ Fourth, the Eugene-Springfield and Medford petitioners contend that the superintendent fatally failed to make required findings of fact with respect to their substantial evidence-based challenges to OSAA's application of placement criteria. The superintendent responds that, given the nature of her standard of review under OAR 581-021-0042(9), ORS 183.470(2) did not require her to render such findings:[6]

"OAR 581-021-0042(9) authorized the superintendent to reverse only if OSAA's 'decision is inconsistent with or [if OSAA] failed to consider all the criteria established by the rules of the voluntary organization and approved by the board under ORS 339.430(3).' Although determining whether any of those grounds requiring reversal required a factual examination of OSAA's conduct, that determination did not require the superintendent to make findings under each criterion in Article 9.2.1(d), or to reveal the particular manner in which she would have applied those criteria to the Medford or Eugene schools had she been in OSAA's shoes."

(Bracketed material in original.) We agree.

Fifth, petitioners contend that, in all events, the district placement of the Eugene-Springfield and Medford high schools was inconsistent, as a factual matter, with the criteria prescribed in Article 9.2.1(d) and that the superintendent erred in determining otherwise. Again, we conclude—without further amplification—that the superintendent's decision

---

[6] ORS 183.470(2) provides:

"A final order shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the underlying facts supporting the findings as to each contested issue of fact and as to each ultimate fact required to support the agency's order."

under the applicable "substantial evidence" standard of administrative review was correct.

Finally, petitioner Marion County School District assigns error to the superintendent's ruling upholding the hearing officer's determination that petitioner would not be permitted to raise new legal issues in a hearing memorandum filed several days before the hearing. The issue that petitioner attempted to raise was whether OSAA's 2006-2010 classification plan, "regardless of whether OSAA did analyze the nine criteria, violates the statutory mandates contained in ORS 326.011, ORS 329.025(13), and ORS 329.250(16)." Petitioner asserts that, because the administrative rule specifying that "grounds for appeal" should be set forth in the petition for review had not yet been adopted at the time that it filed its petition, *see* OAR 581-021-0042(3), (12), it should not be constrained in the issues that it could raise at the hearing. Although petitioner does not contend that the retroactivity provision of the administrative rule is invalid, petitioner asserts that "estoppel" should preclude OSAA or the superintendent from relying on such a retroactive rule.

■ It is unclear what form of estoppel petitioner is asserting applies to this situation. Nevertheless, we appreciate that retroactive application of a procedural administrative rule could, in some circumstances, be unfair. That, however, is not the case here.

The record discloses that, in the course of the lengthy prehearing process, the hearing officer made it clear to the parties that they needed to identify the issues in these consolidated cases. We note that petitioner did, in fact, submit information to the hearing officer well before the hearing that identified the issues it expected to try. We note, further, that one of petitioner's early submissions to the hearing officer, in which it identified issues to be tried, referred to the then-proposed, but not yet adopted, OAR 581-021-0042—*i.e.*, the same rule that petitioner now contends should not have been applied to it. In that submission, petitioner noted that the proposed rule was to be made retroactive and observed that the new rule "will clarify the hearing process."

Thus, the record establishes that this is not a situation in which petitioner was "sandbagged" by some new and

unusual procedural requirement that legal issues must be identified at some point before the eve of the hearing. Rather, petitioner was fully aware of the rule's requirements long before hearing and, nevertheless, failed to raise its contention regarding alleged violation of three statutes until the last minute. The superintendent did not err in sustaining the hearing officer's decision that petitioner could not raise new issues in its hearing memorandum.[7]

In sum, we conclude that none of petitioners' various challenges to the superintendent's final order upholding OSAA's 2006-2010 districting plan are well taken.

Affirmed.

---

[7] We note, as did the superintendent, that the statutes in question concerned student safety, and that petitioner was not precluded from raising issues pertaining to student safety in general. Rather, petitioner was precluded only from adding new claims concerning violations of those statutes particularly.